IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: CONAGRA PEANUT BUTTER PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 1845 ALL CASES 1:07-MD-1845-TWT |

ORDER

This is a products liability action.  It is before the Court on the Plaintiffs'

Motion for Class Certification [Doc. 91].  For the reasons set forth below, the motion

is DENIED.

I. Background

This action arose out of the distribution by ConAgra of peanut butter that was

contaminated by Salmonella bacteria.   The contaminated peanut butter was

manufactured in late 2006 and early 2007 at the Defendant's plant in Sylvester,

Georgia. It is undisputed that hundreds of people got sick after eating the

contaminated peanut butter.   On February 14, 2007, the Food and Drug

Administration issued a national warning advising people not to eat from certain jars

of ConAgra's Peter Pan brand or Great Value brand peanut butter due to a risk of

bacteria contamination. At the same time, the FDA announced a recall of the

implicated peanut butter. The FDA specifically identified the presence in the peanut butter of Salmonella bacteria. The contaminated jars of peanut butter were all manufactured at ConAgra's plant in Sylvester, Georgia and bore a product code beginning with "2111."

The FDA's February 14, 2007, warning was based on an epidemiological study by the Centers for Disease Control and Prevention (CDC), and state and local health agencies, which linked, at that time, 288 incidents of food-borne illness in 39 states to consumption of ConAgra's peanut butter. On February 16, 2007, the FDA confirmed the presence of Salmonella bacteria in opened jars of Peter Pan and Great Value peanut butter obtained from infected persons.  As of February 27, 2007, according to the CDC, there were at least 370 cases from 42 states of Salmonella bacteria illness caused by ConAgra's peanut butter, with at least 60 requiring hospitalization.  By March 7, the CDC had reports of 425 people in 44 states having been infected with Salmonella Tennessee bacteria, 71 of whom were hospitalized.  By March 9, the recall of ConAgra's peanut butter was extended back to include all peanut butter manufactured at the Sylvester, Georgia plant from October 2004 on.  On June 1, 2007, the date of the last public announcement about the outbreak from the CDC or FDA, the CDC had confirmed that as of May 22, 2007, 628 people in 48 states had been infected with Salmonella from contaminated ConAgra peanut butter.

Post-recall product testing demonstrated that the vast majority of the recalled peanut butter was free of contamination. For example, testing of 1,340 jars of peanut butter thought by potential claimants to have caused illness yielded less than a two percent positive rate for Salmonella. Undistributed product tested by the FDA showed even lower rates of contamination. ConAgra, nonetheless, immediately offered full refunds to all purchasers of recalled peanut butter. The recall received a lot of publicity and prompted widespread participation in the refund program. For example, ConAgra received nearly a million phone calls on the day that the recall was announced, and media coverage generated over 600,000,000 media "impressions" the day after the initial press release. As of January 2008, ConAgra has refunded $2,984,308.68 directly to consumers, representing 941,302 jars of peanut butter. ConAgra also has reimbursed retailers $30,665,293.00 for inventory that was in the retailers' possession at the time of the recall or for product returned to the retailers by customers.

Personal injury and consumer class actions were filed all over the country. The Judicial Panel on Multidistrict Litigation transferred the actions pending in federal court to this Court for coordinated or consolidated pretrial proceedings. (See Transfer Order [Doc. 1]). The cases included individual actions and numerous class actions. The Plaintiffs then filed a Master Complaint in this Court in which they seek to

represent two classes.  The first is a proposed class of purchasers of ConAgra peanut butter "which was rendered unusable and valueless by the February 14, 2007 recall of such peanut butter."  The Plaintiffs seek to recover economic loss for this class under a theory of unjust enrichment.  The second is a proposed class of persons who consumed ConAgra peanut butter and "who assert or allege claims sounding in personal injury therefrom."  As to this class, the Plaintiffs seek certification under Rule 23(c)(4) of common liability issues.  Both of the proposed classes are national in scope.

## II.  Class Certification Standard

To maintain a case as a class action, the party seeking class certification must satisfy each of the prerequisites of Rule 23(a) and at least one of the provisions of Rule 23(b).  Klay v. Humana, Inc., 382 F.3d 1241, 1250 (11th Cir. 2004).  Rule 23(a) sets forth the four prerequisites to maintain any claim as a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These prerequisites are commonly referred to as:  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.

Cooper v. Southern Co., 390 F.3d 695, 711 n.6 (11th Cir. 2004).  Failure to establish any one of the four factors precludes certification.  In addition, under Rule 23(b), the individual plaintiffs must convince the Court that: (1) prosecuting separate actions by or against individual members of the class would create a risk of prejudice to the party opposing the class or to those members of the class not parties to the subject litigation; (2) the party opposing the class has refused to act on grounds that apply generally to the class, necessitating final injunctive or declaratory relief; or (3) questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b).  The party seeking class certification bears the burden of proving that these requirements are satisfied.  General Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982); Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1187 (11th Cir. 2003).

The decision to grant or deny class certification lies within the sound discretion of the district court.  Klay, 382 F.3d at 1251; Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1386 (11th Cir. 1998) (en banc).  When considering the propriety of class certification, the Court should not conduct a detailed evaluation of the merits of the suit.  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974).  Nevertheless, the Court must perform a "rigorous analysis" of the particular facts and arguments

asserted in support of class certification.  <u>Falcon</u>, 457 U.S. at 161; <u>Gilchrist v. Bolger</u>, 733 F.2d 1551, 1555 (11th Cir. 1984).  In doing so, the Court is permitted to look beyond the pleadings to determine if certification is appropriate.  <u>Falcon</u>, 457 U.S. at 160.

## III. <u>Discussion</u>

It is unnecessary to address every element of the Rule 23 class action analysis. Of the Rule 23(a) requirements, ConAgra disputes only typicality.  As to Rule 23(b), the Plaintiffs concede that class certification must proceed under Rule 23(b)(3).  In addition, the Plaintiffs concede that there are issues affecting individual class members such as specific causality and damages that limit the personal injury class to a common issues class under Rule 23(c)(4).

### A.    <u>Choice of Law</u>

As noted above, the purchaser class seeks to recover on a theory of unjust enrichment.  As to this class, the Plaintiffs argue that Georgia's choice of law principles should apply to all claims. Generally, a federal court sitting in diversity applies the choice of law rules of the forum state.  <u>Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.</u>, 485 F.3d 1233, 1240 (11th Cir. 2007) (<u>citing Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941)).  More specifically, in multidistrict litigation under 28 U.S.C. § 1407, the transferee court applies the state

law that the transferor court would have applied.  <u>Murphy v. F.D.I.C.</u>, 208 F.3d 959, 965 (11th Cir. 2000) ("Our [federalist] system contemplates differences between different states' laws; thus a multidistrict judge asked to apply divergent state positions on a point of law would face a coherent, if sometimes difficult, task."); <u>see also</u> <u>Roofing & Sheet Metal Services, Inc. v. La Quinta Motor Inns, Inc.</u>, 689 F.2d 982, 991 (11th Cir. 1982) (<u>citing</u> <u>Van Dusen v. Barrack,</u> 376 U.S. 612 (1964)).  In essence, "[a] change of venue . . . generally should be, with respect to state law, but a change of courtrooms."  <u>Van Dusen</u>, 376 U.S. at 639.  Accordingly, all states in which the transferor court of an individual action sits are considered forum states, and an independent choice of law determination is necessary for the states of all transferor courts.  <u>In re Bridgestone / Firestone, Inc. Tires Products Liability Litigation</u>, 155 F. Supp. 2d 1069, 1078 (S.D. Ind. 2001) (<u>citing</u> <u>In re Air Crash Disaster Near Chicago, Ill., on May 25, 1979</u>, 644 F.2d 594, 610 (7th Cir. 1981)); <u>see also</u> <u>In re Managed Care Litigation</u>, 298 F. Supp. 2d 1259, 1296-97 (S.D. Fla. 2003) ("In cases transferred pursuant to 28 U.S.C. § 1407, the transferee district court must apply the state law, including its choice of law rules, that would have been applied had there been no change of venue.").  Significantly, a transferee court may not assign a transferred case to itself for trial.  <u>See</u> <u>generally</u> <u>Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach</u>, 523 U.S. 26 (1998).  Although the general framework is nearly universally

agreed upon, complexity arises when a multidistrict litigation court must determine

which transferor court's law to apply.  At the time this action was consolidated before

this Court, separate actions had been filed in thirteen separate districts and ten states.

The Plaintiffs, however, contend that "[t]he  Master Complaint is the operative

pleading for purposes of the movants' motion for class certification."  (Reply Br. in

Supp. of Pls.' Mot. for Class Certification, at 9).  According to the Plaintiffs, all the

proposed class representatives filed their original complaints in Georgia.[1]  Further,

those same proposed class representatives each "submitted ... a declaration affirming

that the Master Complaint is their [individual] operative complaint for purposes of

their Motion for Class Certification."  (Reply Br. in Supp. of Pls.' Mot. for Class

Certification, at 10). Consequently, the Plaintiffs argue, Georgia law is the only law

that need apply in the entire action.

Using a master complaint as the operative pleading for choice of law purposes

is not unprecedented in multidistrict litigation See In re Bridgestone / Firestone, 155

F. Supp. 2d at 1078 ("[T]he parties agree that this Court should be treated as the forum

court because Plaintiffs filed their Master Complaint in this Court.").  However, it is

generally used as a substantive pleading only when the parties have consented to such

_____

[1]One plaintiff filed his initial complaint in Tennessee.  The Plaintiffs argue
that this is irrelevant and that he should be able to dismiss his original complaint if
necessary to make the Master Complaint his operative pleading.

an arrangement.   See id.; 15 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3866 (citing In re Guidant Corp. Implantable Defibrillators Products Liability Litigation, 489 F. Supp. 2d 932, 935 (D.C. Minn. 2007)); see also DAVID F. HERR, ANNOTATED MANUAL FOR COMPLEX LITIGATION § 20.132 (4th Ed.) (citing In re Dippin' Dots Patent Litigation, MDL No. 1377, Docket No. 00-907 (N.D. Ga. July 23, 2001)).  The Defendant objects to the Plaintiffs' effort to apply Georgia choice of law rules to all of the unjust enrichment claims.  The Defendant  argues that the Court  must apply the choice of law rules of all of the transferor courts.

The Plaintiffs rely upon  MDL cases concerning nationwide class actions in which only one state's choice of law was applied.  These courts, the Plaintiffs contend, selected the choice of law of the state where the class action was initially filed.  See In re Propulsid Products Liability Litigation, 208 F.R.D. 133, 136 (E.D. La. 2002). Likewise, the Plaintiffs argue, Georgia's choice of law should apply because the proposed class representatives sought certification initially in this Court.   The application of Georgia's choice of law rules could prove crucial because of a quirk in Georgia's choice of law rules.   Georgia courts apply their own substantive law for claims under the common law. Frank Briscoe Co., Inc. v. Georgia Sprinkler Co., Inc., 713 F.2d 1500, 1503 (11th Cir. 1983) ("When no statute is involved, Georgia courts

apply the common law as developed in Georgia rather than foreign case law."). Such a finding would bolster the claim that common questions of law predominate over the proposed classes as required under Rule 23(b). However, it also results in a hybrid monster in which Georgia substantive law applies to some elements of the personal injury class claims and not to others.

Although cases cited by the Plaintiffs do indeed apply the choice of law provisions of one state in MDL class actions, those courts all shared concerns that would prevent the application of Georgia choice of law rules in this case. The Propulsid court applied the choice of law of the lone class representative's state with little elaboration as to why it applied only one state's law and not the laws of the other MDL states. The court did take pains, however, to clarify that the master complaint was to be a procedural device only. Id. at 141-42. The court was concerned that an MDL state's choice of law rules might apply even when the original action was filed in another state, and it was wary that utilizing a master complaint as a substantive pleading would make the MDL court the transferor court "for all individual actions filed in the MDL." Id. Allowing the master complaint to operate as a traditional complaint would therefore risk circumvention of Lexecon's remand requirement. Id. at 141; accord In re Vioxx Products Liability Litigation, 239 F.R.D. 450 (E.D. La. 2006) (following Propulsid by finding master complaint to be an administrative device

but applying the choice of law of proposed class representatives from New Jersey only).

The Plaintiffs also cite In re Rezulin Products Liability Litigation, 390 F. Supp. 2d 319, 330 (S.D.N.Y. 2005).  In that MDL class certification, the court applied the choice of law of two states - New York and Louisiana - because those were the states in which the actions were initially filed.  The court found that an amended complaint should be "a series of separate actions initially filed in the respective districts, in which case the choice of law rules of the relevant states, here Louisiana and New York, would be applied respectively to the claims of the plaintiffs from those states." Id. at 330 n.62.  The Rezulin court reached this conclusion because: (1) MDL master complaints were grounded upon consolidation under Rule 42(a); (2) consolidation is a procedural device for judicial economy, and should not change the rights of parties in separate suits; and (3) choice of law is substantive because it affects the rights of the parties.  For those reasons, the court was likewise wary to give a master complaint the effect of a traditional pleading.

Another case cited by the Plaintiffs, In re Welding Fume Products Liability Litigation, 245 F.R.D. 279 (N.D. Ohio 2007), applied only one state's choice of law in an MDL class certification order.  There too, however, the plaintiffs initially filed their class action suit in a state other than the MDL state.  The court found that it was

"immaterial that the [class action] plaintiffs subsequently filed their First Amended Complaint on the MDL master docket, as opposed to the [initial] docket." Id. at 295, n.90. The court, quoting Propulsid, likewise emphasized the procedural nature of the master MDL docket in applying the choice of the law of the state where the original action was filed. Id. Finally, the Plaintiffs cite In re Guidant Corp. Implantable Defibrillators Products Liability Litigation, 489 F. Supp. 2d 932 (D.C. Minn. 2007). That order did not pertain to class certification, but only dealt with one of the MDL's "bellweather plaintiffs" who was seeking determination of choice of law. Id. at 934. The Guidant court applied "undisputed hornbook law" of treating the master complaint as an administrative device where there was no "authority on point for the unusual and unique situation in this case. Namely, where the defendant is located in the state where the MDL court sits." Id. at 936.[2]

The parties did not extensively brief the Court on the implications of applying the choice of law principles of each transferor court. The obvious inference is that such a finding would automatically make a class unmanageable. See Klay, 382 F.3d at 1261 ("Assuming that the district court was correct in ruling that the laws of all fifty

---

[2]The Guidant court opined that "the interplay between the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, traditional venue statutes, and choice-of-law rules is far from clear." In re Guidant, 489 F. Supp. 2d at 935.

states apply, that alone would render the class unmanageable.") (quoting Andrews v. American Tel. & Tel. Co., 95 F.3d 1014, 1024 (11th Cir. 1996)).  Even if a class is not ipso facto unmanageable due to the application of every state's choice of laws, the substantive laws of each jurisdiction would be implicated.   For example, the Defendant alleges that two of the representative plaintiffs of the proposed purchaser class are residents of Tennessee.   (Def.'s Br. in Opp'n to Pls.' Mot. for Class Certification, at 36-37).  The Defendant claims - and the Plaintiffs do not dispute - that Tennessee applies the law of the place of the tort, or *lex loci delicti*.  Hataway v. McKinley, 830 S.W.2d 53, 58 (Tenn. 1992).  Under that doctrine, the place of the tort is generally the place where the injury was suffered.  16 AM. JUR. 2D CONFLICT OF LAWS § 126.  Since one of the class representatives, Caleb Lakin, originally filed his case in the Eastern District of Tennessee, Tennessee is the transferor court for at least one class representative.   Admittedly, the Plaintiffs urge that Plaintiff Lakin's dismissal of his original claim and refiling in Georgia could make the MDL court the transferor court.   Cf. DAVID F. HERR, ANNOTATED MANUAL FOR COMPLEX LITIGATION § 20.132 ("Soon after transfer, the plaintiffs in an action transferred for pretrial from another district may seek or be encouraged to dismiss their action and refile the action in the  transferee district, provided . . . the defendant(s) agree.").

The Plaintiffs contend that there is no real conflict in the different substantive laws of the states.  Relying on <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797, 821-22 (1985),  the Plaintiffs contend that it is acceptable for the Court to apply only Georgia substantive law because Georgia has significant contacts to the Plaintiffs' claims.  In <u>Phillips Petroleum</u>, the Supreme Court enumerated a test for when the application of the single forum's states substantive  law could be applied in a multistate class action. <u>Id.</u>  Seeking to apply the  test to this case, the Plaintiffs contend that the only "question is simply whether applying Georgia law is arbitrary or unfair."  (Resp. Br. to Def.'s Surreply in Opp'n to Pls.' Mot. for Class Certification, at 3).  Of course, the Defendant's peanut butter plant at issue in this case is located in Georgia.  But given the peculiar posture of MDL litigation, Georgia is not the only forum state in this litigation.  <u>Cf.</u> <u>In re St. Jude Medical, Inc.</u>, 425 F.3d 1116, 1120 (8th Cir. 2005) (applying test of <u>Phillips Petroleum</u> in appeal of class certification within MDL).  The <u>Phillips Petroleum</u> decision did not concern MDL consolidation, but rather a traditional multistate class action filed in state court.  Considering the policy of <u>Lexecon</u>, the Court is not convinced that the inquiry of <u>Phillips Petroleum</u> is appropriate for this case.  Furthermore, even if that inquiry were proper, at least one appellate court has expressed doubt as to whether a state passes the "significant

contacts" test even if the manufacturer in a personal injury case is headquartered

within that state:

> Application of Minnesota law to all plaintiffs' claims ultimately may be proper, although we suspect Minnesota lacks sufficient contacts with all the parties' claims, and the different states have material variances between their consumer protection laws and Minnesota's.  There is no indication out-of-state parties "had any idea that [Minnesota] law could control" potential claims when [the plaintiffs] received their products.

See In re St. Jude Medical, Inc., 425 F.3d at 1120 (quoting Phillips Petroleum, 472

U.S. at 822).  Additionally, for reasons discussed below, there is substantial conflict

between Georgia law and other jurisdictions on the issues of personal injury and

unjust enrichment.  See Phillips Petroleum, 472 U.S. at 816 ("no injury" in applying

single state's law unless that state's law conflicts with other jurisdictions implicated

in suit).

B.    Predominance

In order to certify a class, a district court must find that the proposed class

satisfies the requirements of Rule 23(a), and also one of the requirements of Rule

23(b).  Mills v. Foremost Ins. Co., 511 F.3d 1300, 1308 (11th Cir. 2008) (reversing

district court for failing to consider all three tests under 23(b)).  As noted, it is the

burden of the individual plaintiffs to show that the proposed class meets these

requirements.  In their extensive briefing for this Motion, the Plaintiffs have only

discussed in detail how their proposed class satisfies Rule 23(b)(3) on grounds of predominance and superiority.  In light of the Plaintiffs' burden, the Court should deem any arguments for certification on grounds of Rule 23(b)(1) or Rule 23(b)(2) as waived.

The Defendant argues that class certification is inappropriate because common issues of law and fact do not predominate over individual issues.  Pursuant to Rule 23(b)(3), the Court considers: (1) whether issues of law or fact common to members of the class predominate over questions affecting only individual members; and (2) whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).  On the question of predominance, it is not necessary that all questions of law or fact be common.  Nevertheless, "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." Cooper v. Southern Co., 390 F.3d 695, 722 (11th Cir. 2004).  Critically, "[w]hether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." Klay, 382 F.3d at 1255.  "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most

or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." Id.

Under Rule 23(b)(3), common questions of law or fact must predominate.  In a nationwide class, variations in state law may swamp any common issues and defeat predominance.  "It goes without saying that class certification is impossible where the fifty states truly establish a large number of different legal standards governing a particular claim." Id. at 1261.  "To certify a multi-state class action, a plaintiff must prove through 'extensive analysis' that there are no material variations among the law of the states for which certification is sought." Id. at 1262 (citations omitted).  A district court should deny certification if the  plaintiff fails to carry this burden. Id.

At the outset, the Defendant claims that nearly every state has a statute preempting common law unjust enrichment claims because of enactment of the Uniform Commercial Code ("UCC").  (Def.'s Br. in Opp'n to Pls.' Mot. for Class Certification, at 40) ("Thus, in forty-nine states and the District of Columbia, the purchase of peanut butter is accomplished pursuant to a Uniform Commercial Code contract.").  UCC Sections 2-314 through 2-318 establish implied  warranties of fitness.  In the version of § 2-318 enacted by the majority of states, privity between the parties is necessary for breach of warranty claim if there is no injury to the person. See 18 RICHARD A. LORD, WILLISTON ON CONTRACTS § 52:39 (4th Ed.).  A number

of states, however,  have enacted a version of § 2-318 that would apply to situations of both personal injury and economic loss.  Alternative C of § 2-318 eliminates the need for privity of contract in breach of warranty actions whenever the claim is simply for "injury."  Some commentators interpret this alternative to cover situations of both personal injury and economic loss.  <u>See</u> 18 RICHARD A. LORD, WILLISTON ON CONTRACTS § 52:39 (4th Ed.); UCC § 2-318, official cmt. ("Alternative C is drawn to reflect the trend of more recent decisions . . . extending the rule beyond personal injuries.").  According to the Official Comment of § 2-318, Hawaii, Iowa, Minnesota, North Dakota, Utah, and the Virgin Islands have adopted Alternative C.[3]

As evidence of more variance of unjust enrichment law, the Defendant argues that many states require a direct benefit conferred by the plaintiff upon the defendant. In the Order denying the Defendant's Motion to Dismiss the unjust enrichment claims, the Court noted that "[a]t a minimum, whether the Plaintiffs bestowed a direct benefit upon the Defendant is a question of fact which cannot be resolved at this stage of the litigation." [Doc. 297].  This observation does not change the fact that common issues of law do not predominate with respect to  the unjust enrichment claim.  The existence of the direct benefit requirement in some states underscores the differing legal

---

[3]Hence, even under Georgia's choice of law scheme, the unjust enrichment laws of at least six states would need to be applied.  Louisiana, a civil law jurisdiction, also has an unjust enrichment statute.  La. Civ. Code. art. 2298.

standards that would need to be applied.   One district court has found that Florida, Idaho, and Ohio "preclude indirect purchasers from asserting claims for unjust enrichment unless they have conferred a benefit directly on the defendant." <u>Powers v. Lycoming Engines</u>, 245 F.R.D. 226, 232 (E.D. Pa. 2007).   There is authority that North Carolina restricts suits by indirect purchasers as well.   <u>See</u> <u>In re Relafen Antitrust Litigation</u>, 221 F.R.D. 260, 287 (D. Mass. 2004).   The Plaintiffs protest that Florida does not require the literal direct benefit that some courts have found.   <u>See MacMorris v. Wyeth, Inc.</u>, Slip Copy, 2005 WL 1528626, at *4 (M.D. Fla. 2005) ("Plaintiff is correct that indirect purchasers have been allowed [in this state] to bring an unjust enrichment claim against a manufacturer.").   There is conflicting authority. <u>See</u>, <u>e.g.</u>, <u>Tilton v. Playboy Entertainment Group, Inc.</u>, Slip Copy, 2007 WL 80858, at *3 ("An indirect benefit is not sufficient to support a claim for unjust enrichment.").   This morass is useful to establish not only the lack of uniformity of unjust enrichment claims across the country, but also the inferiority of class-wide resolution due to discerning the many differing legal standards.

Other differences among the state unjust enrichment schemes exist.   For instance, a typical unjust enrichment test lays out three elements to be met for an unjust enrichment claim.   However, courts in at least six states have a five part test for unjust enrichment, and courts in three more require a four part test.   Some states are

content with one or two elements.  See Porter v. Hu, 169 P.3d 994, 1007 (Hawaii App. 2007) ("One who receives a benefit is of course enriched, and he would be unjustly enriched if its retention would be unjust.").  It is true that many elements are broken down more precisely in some states, such that the number of elements in and of itself is not a material variance.  Compare Darling v. Standard Alaska Production Co., 818 P.2d 677, 680 (Alaska 1991) (a benefit conferred upon the defendant by the plaintiff) with Community Guardian Bank v. Hamlin, 898 P.2d 1005, 1008 (Ariz. App. 1995) (elements include "(1) an enrichment; (2) an impoverishment" and "(3) a connection between the enrichment and the impoverishment").  The underlying point remains - there are a number of substantive differences from state to state.  Perhaps the most prominent example is the state of mind required of an unjust enrichment defendant. Many states, such as Oregon, require that the defendant has "awareness" of a received benefit.  Summer Oaks Ltd. Partnership v. McGinley, 55 P.3d 1100, 1104 (Or. App. 2002).  Similarly, other states require that the defendant have an appreciation or knowledge of the benefit.  Many other states however, do not explicitly require a particular state of mind .  See Dews v. Halliburton Industries, Inc., 708 S.W.2d 67, 69 (Ark. 1986).

The Plaintiffs' fifty-state survey, downplaying the significance of state law variations, proclaims that in all states "unjust enrichment occurs when defendant

acquires benefit inequitably or through wrongdoing." (Pls.' Resp. to Def.'s Surreply in Opp'n of Pls.' Mot. for Class Certification, Ex. 2).   That fails to account for important variances, namely state of mind, the effect of implied warranties, and direct benefit requirements.   Taken together, the Plaintiffs have failed to carry their burden that there are no material variations in state law.   The many differences among jurisdictions should prevent the Court from finding that common issues of law predominate on this claim.   <u>See</u> <u>In re Sears, Roebuck & Co. Tools Mktg. & Sales Litigation</u>, 2006 WL 3754823 (N.D. Ill. Dec. 18, 2006).   Proof of damages under a theory of unjust enrichment also requires individualized determinations.   <u>See</u> <u>Klay</u>, 382 F.3d at 1267; <u>Sikes v. Teleline, Inc.</u>, 281 F.3d 1350, 1365 (11th Cir. 2002).   As discussed in greater detail below, the Plaintiffs seek to avoid this hurdle by ignoring it.   Whether treated as a predominance question or a manageability question, this is fatal to the quest for certification of a purchaser class.

The Plaintiffs also seek certification of a personal injury class.   Under the law of the Eleventh Circuit, the combination of significant individualized questions going to liability and the need for individualized assessments of damages precludes Rule 23(b)(3) certification.   <u>Klay</u>, 382 F.3d. at 1260.   Recognizing the enormous hurdle that this represents, the Plaintiffs do not seek certification of a traditional liability and damages class action.   Rather, the Plaintiffs seek certification of their proposed

personal injury class through Rule 23(c)(4)(A), which allows certification of particular issues.  In doing so, the Plaintiffs acknowledge that there are a "myriad of different circumstances and defenses" which relate to "individual issues of causation and damages."  (Reply Br. in Supp. of Pls.' Mot. for Class Certification, at 32).  This is not a case where damages may be calculated using some formula, statistical analysis or other essentially mechanistic method.  Nonetheless, according to the Plaintiffs, an issues class is appropriate to determine whether the issues involving the Defendant's "knowledge, conduct, and duty" surrounding the contaminated peanut butter.  (Id.) However, the Defendant maintains that "the contested issues are those related to exposure, specific causation - whether an individual ingested tainted ConAgra peanut butter, became ill as a result and suffered injury and damages - and the extent of the injury and damages."  (Def.'s Br. in Opp'n to Pls.' Mot. for Class Certification, at 72). Still, the Plaintiffs caution the Court that the Defendant has not conceded negligence; if it had, "there admittedly would be less need for a common issues trial."  (Reply Br. in Supp. of Pls.' Mot. for Class Certification, at 34); see also Klay, 382 F.3d at 1255 ("Whether an issue predominates can only be determined after considering what value the resolution of the class - wide issue will have in each class member's underlying cause of action.") (citations omitted).   Although the Defendant has not formally admitted liability, it is highly unlikely that it will deny that Salmonella-contaminated

peanut butter is a defective product and makes people sick who eat it.  The Court is not convinced that an issues class would promote judicial economy or materially advance the litigation.

Denying the common issues personal injury class also avoids potential constitutional problems.  One leading commentator has urged courts to avoid Rule 23(c)(4) issues classes which could violate the parties' Seventh Amendment jury-trial rights.  7AA CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 1790.  This concern seems especially apt in personal injury cases.  Although personal injury and negligence claims follow the same general principles in nearly all jurisdictions, many jurisdictions differ on the details.  "[N]uance can be important, and its significant is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts."  In the Matter of Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1300 (7th Cir. 1995) (denying issue class certification out of Seventh Amendment concerns).  To be sure, not all negligence issue classes violate the Seventh Amendment.  See, e.g., Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620 (5th Cir. 1999) (upholding certification where second jury would not reconsider earlier findings on negligence issues).  In light of the limited value of the proposed personal injury issues class discussed above, the risk that a

second jury would have to reconsider the liability issues decided by the first jury is too substantial to certify the issues class.   The Court will heed binding authority "caution[ing] that separate trials of liability and damages must be approached with trepidation" to avoid offending the Seventh Amendment.   <u>State of Alabama v. Blue Bird Body Co., Inc.</u>, 573 F.2d 309, 318 (5th Cir. 1978) (citations omitted).

C.   <u>Superiority</u>

With respect to the purchaser class, the Plaintiffs assert that "[t]he class mechanism is superior because it solves the problem [of cost-effective adjudication of these hundreds of thousands of small claims], enables all purchasers to adopt a common claim, which in turn enables the aggregate remedy to be calculated from the defendant's records, and then distributed administratively pursuant to a common formula and procedure." (Pls.' Mot. for Class Certification, at 46).   At oral argument, the Plaintiffs' counsel suggested that the damages formula would be based upon the retail value of all of the peanut butter sold during the class period or ConAgra's profits from peanut butter during the period.   Thus, the actual injury to the Plaintiffs' purchaser class and the proposed remedy are completely disconnected.   Since most ConAgra peanut butter was free of contamination some  consumers ate all the peanut butter they purchased either prior to or after the recall without ill effect. Others ate at

least a portion of it without ill-effect. Consequently, some attained the full value of their purchase, while others attained at least some value.

And, all claimants still can obtain a full refund for their purchases, whether or not consumed, simply by participating in ConAgra's ongoing refund program.  The Plaintiffs address this manageability problem by ignoring it altogether.  The Plaintiffs make no attempt to provide legal authority for this "aggregate remedy" given among other things the diversity and complexity of unjust enrichment law in the 50 states. The novelty of the proposed remedy reflects the unmanageability of a class applying traditional principles of unjust enrichment.  ConAgra's financial records may show what revenues ConAgra derived from grocery stores and other wholesale customers, but not any "benefit" provided by any of the Plaintiffs, none of whom purchased peanut butter directly from ConAgra. The Plaintiffs simply are proposing that some number derived from ConAgra's records be used as a surrogate for that benefit in order to facilitate class certification. It is impermissible, however, to determine damages on a class-wide basis in order to facilitate class treatment of a case where the governing law requires individual proof of damages.  See McLaughlin v.  American Tobacco Co., 522 F.3d 215, 231-32 (2nd Cir.  2008).  Having found that common issues do not predominate as to either class,  the Court is  not required to determine whether a class action is superior to other available methods of adjudication to satisfy

the requirement of Rule 23(b)(3).  <u>Mills v. Foremost Ins. Co.</u>, 511 F.3d 1300, 1308 (11th Cir. 2008) (plaintiff must show that common questions of law or fact predominate and show superiority of class action in to satisfy 23(b)(3)).  However, some discussion about the superiority of the proposed purchaser and personal injury classes is warranted in the event that there is interlocutory review of this Order.

Certification should not be denied for lack of superiority solely because a class action would make a district court's task complex or difficult.  Instead, the "focus is . . . on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs."  <u>Klay</u>, 382 F.3d at 1269. The Plaintiffs argue that the class action is superior because the unjust enrichment plaintiffs would have little incentive to pursue their individual claims.  (Pls.' Mot. for Class Certification, at 44).  The Defendant contends that it has already instituted a superior method of resolution; it has been issuing full refunds to purchasers of the potentially contaminated peanut butter since the outbreak.  The issue, then, is whether non-litigation alternatives may be considered when making a judgment on the superiority of class action litigation.  <u>Compare</u> <u>Turner v. Murphy Oil USA, Inc.</u>, 234 F.R.D. 597, 610 (E.D. La. 2006) ("The analysis is whether the class action format is superior to other methods of adjudication, not whether a class action is superior to an out-of-court, private settlement program.") <u>with</u> <u>Chin v. Chrysler Corp.</u>, 182 F.R.D.

448, 462-65 (D.N.J. 1998) (considering defendant's reimbursement as a part of recall program in declining to find certification superior).

The preference of the Eleventh Circuit might be gleaned by its dictate to district courts to inquire whether a "class action is superior to other available methods for the fair and efficient *adjudication* of claims." Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1326 (11th Cir. 2008) (quoting Klay, 382 F.3d at 1269) (emphasis added). Implicit in this pronouncement is that the superiority of a class action be compared with other litigation alternatives. (Reply Br. in Supp. of Pls.' Mot. for Class Certification, at 65). Yet the Plaintiffs did not cite any cases in this Circuit specifically holding that only litigation alternatives be considered. One prominent commentator has suggested that courts consider non-litigation alternatives: "The court need not confine itself to other available 'judicial' methods of handling the controversy in deciding the superiority of the class action." 7AA CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 1779 (citing Berley v. Dreyfus & Co., 43 F.R.D. 397, 398-99 (S.D.N.Y. 1967)). Another recent district court order found a refund program superior to class litigation. In re Phenylpropanolamine (PPA) Products Liability Litigation, 214 F.R.D. 614, 622 (W.D. Wash. 2003). In that case, the court lauded the effectiveness of the refund program, even if claimants were required to show physical proof of purchase.

Id. Such potential exclusion of legitimate claimants was acceptable because physical proof of purchase would nonetheless be "a necessary requirement for class identification purposes." Id. In sum, the court noted that it made "little sense to certify a class where a class mechanism is unnecessary to afford the class members redress." Id. The Court finds such reasoning applicable in this case. Here, the purchaser class is seeking recovery through an unjust enrichment theory. This theory would require the Defendant to disgorge the benefit of each jar of peanut butter sold. The measure of the benefit to the Defendant would likely be less than the retail price of a jar - especially factoring in the costs of attorneys' fees. Further, the Defendant has even "volunteered" to provide refunds in some instances without a proof or purchase or consumption. (Def.'s Br. in Opp'n to Pls.'Mot. for Class Certification, at 57, n.24). As a result, the Defendant's voluntary program would likely require no more (and probably less) proof that a claimant actually purchased the peanut butter than would be required in litigation. Given these factors, the important policy concern that individuals were not or will not be able to recover because of small individual recoveries is not heavily implicated in this case.

The Plaintiffs further protest that any notice the Defendant provided the public for its refund program would be inferior to class action notices guided by this Court. According to the Defendant, the public received "massive" notice of the contaminated

peanut butter through its own press releases, information on its website, and general news coverage.  (Surreply Br. in Opp'n to Pls.' Mot. for Class Certification, at 11).  The Plaintiffs claim those combined efforts were insufficient notice.  After all, the Plaintiffs cite cases where notices or advertisements were printed in hundreds of newspapers.  <u>See</u>, <u>e.g.</u>, <u>In re Domestic Air Transportation Antitrust Litigation</u>, 141 F.R.D. 534, 548 (N.D. Ga. 1992) ("Plaintiffs propose to publish the entire notice in . . . 100 newspapers with the largest circulation in the United States. . ."); <u>In re Lupron Marketing & Sales Practices Litigation</u>, 228 F.R.D. 75, 85 (D. Mass. 2005) (notice published in, among other things, 947 newspapers).  However, in my view, the standard for sufficient notice for a company's voluntary refund program should not be that of a class action suit.  The Defendant has introduced evidence that news of its refund program has been widely disseminated and received.  The Defendant claim that it has paid nearly three million dollars "directly to consumers for claims relating to more than 941,000 jars of peanut butter. . . In addition, ConAgra has paid more than $30,665,293.00 to retailers to compensate them for refunds they issued to consumers or for product they had in their possession at the time of the recall and did not sell."  (Def.'s Br. in Opp'n to Pls.' Mot. for Class Certification, at 57).  According to the Defendant, in the first week after it announced its recall program, the Defendant received at least 1,365,352 calls regarding the program.  (Sautter Aff. ¶ 6).  Although

the Defendant initially fielded these calls with only varying degrees of success, the fact remains that  the public was notified of the program immediately after its inception.  And, as the Defendant notes, the program is ongoing.  For these reasons, the Court does not share the Plaintiffs' concern that the refund program is "minimal, or even illusory."  (Reply Br. in Supp. of Pls.' Mot. for Class Certification, at 63).

The guideposts for evaluating superiority are 1) the interests of class members in individually controlling separate actions, 2) the extent and nature of litigation already commenced, 3) the desirability of continued litigation in a particular forum, and 4) difficulties likely to be encountered in managing the class action.  De Leon - Granados v. Eller & Sons Trees, Inc., 497 F.3d 1214, 1220 (11th Cir. 2007).  In this case there is no overriding factor suggesting class certification is superior.  I find that a class action would not be the superior method to resolve the claims of the proposed purchaser class.

With respect to the personal injury class, the Plaintiffs must demonstrate that class certification will materially advance the final disposition of the litigation as a whole.  Notwithstanding a valiant effort, the Plaintiffs' case for class certification collapses when it confronts the  fact that certification of a common issues class will not dispose of a single case or eliminate the need for a single trial.  Any saving in judicial resources is speculative at best.  See Castano v. American Tobacco Co., 84

F.3d 734, 749 (5th Cir. 1996). Under the Plaintiffs' trial plan, at least 6,000 individual trials on exposure, injury, causation, damages and other individual issues will have to be prosecuted whether or not a class is certified, presumably by the lawyers already retained by the personal injury claimants. This is hardly a case, in other words, beset with the problem of "aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 617 (1997). This is not a case where class certification avoids clogging the federal courts with innumerable individual suits litigating the same issues repeatedly. Klay, 382 F.3d at 1273. If class certification is denied, these cases will go forward in essentially the same manner they would if a class were certified, only without an expensive, unnecessary, meaningless, and largely uncontested "common" issues trial.

It would be possible to have a common issues trial on the issue of, for example, "Can eating peanut butter that is contaminated with the bacteria listed above cause illness?" (Reply Br. in Supp. of Pls.' Mot. for Class Certification, at 5). But why bother having a trial on issues of such abstract generality? On the other hand, a class trial of issues such as what the Defendant knew or should have known and the adequacy of its general plant sanitation practices in relation to the onset of illness for thousands of people would require special interrogatories and a verdict form of

unimaginable complexity. I cannot imagine how to fashion a verdict form that would provide meaningful answers to "overarching epidemiological questions" in this case. (Reply Br. in Supp. of Pls.' Mot. for Class Certification, 35). The Plaintiffs' suggestion that a jury could determine what is a "clinically compatible case" in the context of thousands of individual cases of illness is detached from reality. How can notice be given to the class that fairly apprises it of what is to be determined in a common issues trial? On the other hand, there are available other procedures such as bellweather trials which will be useful to the parties in evaluating individual cases.

As to punitive damages, the Plaintiffs' concession that the laws of the 50 states apply precludes class certification. Klay, 382 F.3d at 1262. The Plaintiffs' proposal to use a "reprehensibility" multiplier cannot survive a due process challenge. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 423 (2003) ("Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . ."). Therefore, the Plaintiffs have not met their burden of showing that class certification will materially advance the final disposition of this litigation.

## IV.  Conclusion

For the reasons set forth above, the Plaintiffs' Motion for Class Certification

[Doc. 91] is DENIED.

SO ORDERED, this 22 day of July, 2008.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge