IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA,
ATLANTA DIVISION

| | |
|---|---|
| IN RE CONAGRA PEANUT BUTTER PRODUCTS LIABILITY LITIGATION | Civil Action No. 1:07-MD-1845 TWT |
| **************** | **************** |
| ROGER ARKO, Plaintiff, v. CONAGRA FOODS, INC., Defendant. | Civil Action No. 1:08-CV-03472-TWT |

**PLAINTIFF ROGER ARKO'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff ROGER ARKO respectfully submits this Memorandum of Points and Authorities in Response to the Motion for Summary Judgment (Doc. 2227) submitted to the Court by Defendant CONAGRA FOODS, INC. ("CONAGRA").

# I. INTRODUCTION

**"If at first you don't succeed, try, try again..."**

- W.C. Fields

ConAgra has filed the same or similar motion for summary judgment against various MDL plaintiffs time and time again. With metronomic regularity ConAgra argues that plaintiffs cannot prove causation, symptom onset is post date of manufacture, or lid codes contradict plaintiffs symptoms. ConAgra, with some moderate success, has brought countless such motions against many pro per plaintiffs and others, and in the right cases, this Court has granted such motions. This, however, is not such a case and ConAgra's attempt to shove the round peg of its cut-and-paste summary judgment motion into the square hole of the discrete facts of this case must not be allowed. When viewed through the lens of reasoned thought, and ConAgra's generalizations and mischaracterizations set aside, it is abundantly clear that Roger Arko's case is replete with issues of material fact that must be presented to a jury upon remand. Roger Arko has suffered significant injury at the hands of ConAgra's knowing violation of basic food safety rules and after two and a half years in these MDL proceedings, Mr. Arko deserves his day in Court.

## II. STATEMENT OF FACTS

ConAgra's own motion raises genuine issues of material fact as to whether Plaintiff Roger Arko suffered a debilitating case of salmonellosis caused by his consumption of ConAgra's defective Great Value brand peanut butter. ConAgra's own motion raises triable issues of fact as to whether Mr. Arko purchased salmonella-positive Great Value brand peanut butter from his local Wal-Mart in September 2006, and further raises a triable issue of fact to the medical treatment and testing/culturing performed on Mr. Arko secondary to his symptom on-set.

While oft-repeated by ConAgra in its motion, Mr. Arko has never claimed that the Great Value brand peanut butter he retained at his home at the time of the February, 2007 recall was the bottle of peanut butter he ate from which caused his severe illness, hospitalization and forced him to incur tens of thousands of dollars of medical bills. (Undisputed Material Fact ["UMF"] 14) Mr. Arko has made very clear since the filing of his lawsuit, that the bottle he retained was *not* the bottle he ate from when he became violently ill. (UMF 14)

This should come as no surprise to ConAgra. Food poisoning cases, such as the thousands filed in these proceedings, can create difficult evidentiary issues. In the typical foreign object case, the plaintiff may be fortunate to enough to still have the item causing injury or at least be able to identify it with some accuracy.

In food poisoning cases, however, the "evidence" tends to disappear quickly; forcing the plaintiff to prove causation from his resulting illness and (most often) general facts regarding improper food preparation methods.

Applying California law, which ConAgra agrees is the substantive law at issue in this case, Mr. Arko's evidence of individual causation, coupled with ConAgra's utter disregard for safe food handling practices, sets the stage for a viable product defect claim against ConAgra that must have its day in Court.

Furthermore, the red herring argument that ConAgra makes throughout its motion that Mr. Arko has claimed to have become ill from a Great Value brand product that was produced one month post-onset of symptoms is a gross mischaracterization. Since the outset of this litigation, Mr. Arko has been consistent that he had regularly purchased Great Value brand peanut butter, and that the bottle from which he became ill he'd purchased in the month prior to his symptom onset (UMF 13) He, like many consumers, exercised what is known as "brand preference." Mr. Arko's brand preference was ConAgra's Great Value brand peanut butter and he purchased it regularly before becoming sick. Mr. Arko purchased the defective Great Value brand peanut butter in September 2006 - approximately a month *prior* to his onset of symptoms. (UMF's 13, 15).

Furthermore, Mr. Arko suffered from symptoms secondary to ingestion of

the defective peanut butter that are wholly consistent with salmonellosis. (UMF's 31-33). When coupled with the overwhelming evidence of salmonella in ConAgra's peanut butter, Mr. Arko has a viable and righteous product defect claim against the manufacturer. For these reasons, ConAgra's motion must be denied.

## III. ARGUMENT

### A. SUMMARY JUDGMENT IS A DRASTIC PROCEDURE AND IS INAPPROPRIATE IN THIS CASE

#### i. ConAgra Broke Basic Food Safety Rules

As this Court is well aware, the Center for Disease Control and Prevent ("CDC") investigated the salmonella outbreak caused by ConAgra's failure to follow basic food safety rules in the manufacture of its Great Value and Peter Pan brand peanut butter products. (UMF 17) The CDC found positive findings of *Salmonella Tennessee* in ConAgra's in random sampling of Peter Pan and Great Value brand peanut butters over a wide geographic area. (UMF 18). Similarly, the CDC found positive findings of *Salmonella Tennessee* in ConAgra's Sylvester, Georgia processing plant. (UMF 19).

Additional investigation by the CDC and independent investigators confirmed that ConAgra's Sylvester, Georgia plant was essentially a rat-infested

cess pool of bacterial growth. The investigations culminated in findings that ConAgra had performed its own testing, as far back as 2001, and found high levels of bacteria in the peanut butter it was producing. (UMF 20). In 2004, ConAgra discovered salmonella positive peanut butter being produced at its Sylvester plant and in response destroyed over 80,000 cases of peanut butter. (UMF 21). But the problems didn't end there. In fact, ConAgra's own internal investigation of the 2004 outbreak confirmed that its roaster needed to be replaced, moisture issues related to leaks and condensation problems needed to be addressed, and issues involving sanitation of the plant and vermin infestation needed immediate remediation. (UMF's 22, 23, 24 ) However, ConAgra took no steps to replace its roaster, to eliminate sanitation issues, or otherwise protect the public of the dangers of its adulterated food production. By taking no efforts to implement necessary safety measures recommended by ConAgra's own independent and in-house experts, and in fact by overtly concealing its contamination and sanitation problems, the stage was set for the 2007 Salmonella outbreak that injured thousands of unsuspecting consumers. (UMF 25). This utter disregard for basic food safety production makes one wonder not how this outbreak occurred, but rather why it didn't happen sooner?

ConAgra's Manager of Process Engineering, Richard Schumacher,

inspected the roaster at the Sylvester plant in March 2005 and found it to be "old, in poor repair, dangerous from a food safety, personnel, and business point of view" and recommended the roaster be replaced. (UMF 22) In July 2005, another report stated the roaster was a food safety hazard because the temperatures in the roaster failed to reached "micro-kill" levels. (UMF 21).

In February 2007, the CDC linked salmonella to ConAgra's peanut butter. As a result, ConAgra conducted environmental testing through the Sylvester plant to determine the sources of salmonella in the plant. (UMF 20). According to its own testing, salmonella was found on the top of the overhang at the discharge end of the roaster, the vibratory conveyor feeding the blanching bucket conveyor, a vibratory conveyor leading to a bucket conveyor at the blanching bins, and other locations. (UMF 26). The FDA conducted its own environmental sampling and found salmonella "at the roaster drain at the peanut hopper gate surface and outer edge, and on equipment in the plant and in proximity to the peanut butter processing operations". (UMF 27).

The facts and evidence of this case make it clear that ConAgra either intentionally or negligently flouted basic food safety standards which put their peanut butter and the consumers who purchased it at grave risk for contamination and illness. ConAgra disregarded its own protocols and investigation by allowing

its roaster to operate without achieving a lethal kill of pathogens, and following poor manufacturing processes that all led to 2007 Salmonella outbreak resulting in injury to thousands of plaintiffs, including Roger Arko, and the recall of millions of pounds of peanut butter.

### ii. Roger Arko Can and Will Establish Individual Causation for His Injuries

The gravamen of ConAgra's motion for summary judgment is based on two fallacious arguments: (1) that Mr. Arko's illness pre-dates the manufacture of the subject peanut butter; and (2) Mr. Arko's medical evidence refutes any claim of causation. Both arguments are without merit and thus ConAgra's motion must be denied.

As to the argument that Mr. Arko's illness pre-dates the manufacture of the subject peanut butter, one need only look as far as Mr. Arko's Plaintiff Fact Sheet. As far back as January 2009, when Mr. Arko served his Fact Sheet, he made clear that he purchased the subject Great Value brand peanut butter, with cash, in approximately September 1, 2006 at the Wal-Mart Super Center in San Diego, CA. (UMF 13). Mr. Arko further confirmed at that time that the code on the lid was 21116311991429C which was "on bottle remaining in house on February 20, 2007" when he first received notice of the recall. (See UMF 14) Further, Mr. Arko

stated in responses to interrogatories (served in August, 2009) that "[t]he peanut butter that is at issue was consumed and later discarded. A second jar of peanut butter of the same brand was purchased at the same location as the first and that second jar remains with counsel". (See UMF 15) Thus, ConAgra's disingenuous argument that Mr. Arko has claimed to have become injured by a bottle of peanut butter manufactured in November 2006 is patently false. Mr. Arko has been unwavering since the onset of this litigation, that he purchased Great Value brand peanut butter at his local Wal-Mart store in September 2006 and that the bottle he retained at the time of the recall was one he had purchased subsequently.[1/]

Furthermore, the medical testimony in this case will establish that Mr. Arko's symptoms were consistent with a diagnosis of salmonellosis. The intubation period, the onset of symptoms, the typology of symptoms and Mr. Arko's medical record during hospitalization confirm to a reasonable degree of medical probability that Mr. Arko suffered salmonellosis secondary to ingestion of ConAgra's tainted peanut butter. (UMF's 31-33). ConAgra's argument that Mr. Arko cannot establish causation on the basis that his blood, urine and stool

---

[1]In fact, Mr. Arko's "brand preference" of ConAgra Great Value brand was so strong that he purchased another bottle of it, after his sickness and hospitalization, (unknowing at the time that his earlier purchased bottle had caused his illness) sometime in late November or December 2006, which he retained at the time of the Feb. 2007 recall.

cultures were negative for Salmonella is similarly unavailing. As set forth by plaintiffs' medical expert, Dr. Peter Katona, an infectious disease doctor at UCLA Medical Center, the fact that Mr. Arko had been on a broad-spectrum antibiotics for between 24-48 hours prior to any stool culture being taken, can easily explain why a stool culture of Mr. Arko was negative. (UMF's 34, 35) Similarly, the records of Mr. Arko's urine and blood cultures relied upon by ConAgra (at Exhibit 7) in support of its motion establish nothing other than that they were taken. The blood and urine culture records are essentially irrelevant as it often times the case that blood, urine and/or stool cultures are negative in cases of confirmed salmonella infection. (UMF 36 ) Thus, it should come as no surprise that these cultures (blood and urine) appear negative. (UMF 36) Similarly, as set forth by plaintiff's medical expert, Dr.Katona, the stool culture was more likely than not negative based upon Mr. Arko having received a broad-spectrum antibiotic in the days prior to this culture. (UMF's 34, 35)

Finally, ConAgra's last-ditch argument to refute Mr. Arko's causation claims are based on the specious argument that Plaintiff's peanut butter has not been tested for the presence of salmonella. Well, of course, it has not been tested considering the bottle that plaintiff retains is not the bottle he became ill from. Had plaintiff tested this later-manufactured bottle of peanut butter for salmonella

and the results were positive, ConAgra would be arguing those results proved nothing and were completely irrelevant. In that case, ConAgra would be right. Obviously, Plaintiff would gain no advantage by testing a later-manufactured bottle of peanut butter.

Moreover, ConAgra is well aware that testing of the individual peanut butter bottles for the presence of salmonella is wholly inconsistent and unreliable for a variety of reasons. First, peanut butter has a low moisture content such that the bacteria will not spread and multiply thoughout the jar, and thus it is likely that the contaminated portions of peanut butter may be consumed leaving behind peanut butter that is otherwise salmonella-free. (UMF 28) In other words, a negative test of a jar of peanut butter only suggests that the portions left behind in the jar are not contaminated. (UMF 29) In fact, ConAgra is well aware of the inaccuracy of testing of post-consumer peanut butter; in the CDC testing of *confirmed salmonella positive patients*, testing of the remaining peanut butter bottles from those confirmed cases resulted in a positive salmonella in only 13 percent of cases. (UMF 30).

**B. ConAgra Has Not Met Its Burden on Summary Judgment and Mr. Arko's Case Must Proceed to Trial**

The "federal standard to measure sufficiency of evidence to raise fact

question is used in Ninth Circuit; that test inquires whether evidence in its entirety would rationally support verdict for plaintiff, assuming view of evidence most favorable to plaintiff." Bieghler v. Kleppe, 633 F.2d 531 (C.A.9.Ariz. 1980). Surmise or belief, no matter how reasonably entertained, that party cannot prevail upon trial, will not justify refusing him his day in court with respect to material issues which are not clearly shown to be sham, frivolous, or so unsubstantial that it would be obviously futile to try them. Griffeth v. Utah Power & Light Co., 226 F.2d 661 (C.A.9 (Idaho)1955). On a motion for summary judgment, neither an appellate court nor a trial court is permitted to weigh the evidence, pass upon credibility, or speculate as to the ultimate findings of fact. Aronsen v. Crown Zellerbach, 662 F.2d 584 (C.A.9.Cal.,1981). Summary judgment is not appropriate where the record, including documents and pleadings, establishes facts which give rise to contradictory inference, one of which supports the party opposing the motion. U. S. v. Lange, 466 F.2d 1021(C.A.9.Cal.,1972).

Here, the record is replete with questions of material fact that demands ConAgra's motion be denied. Questions of fact regarding Mr. Arko's purchase of the peanut butter, his medical causation, as well as the nature and extent of his injuries under various theories of liability are replete throughout this record. Further, when viewed in the light most favorable to the plaintiff with all

reasonable inferences drawn in his favor, it is very clear that triable issues of fact exist in this case which must have their day in Court.

### C. Controlling California Case Law Affords Mr. Arko His Day in Court

The case of Sarti v. Salt Creek, Ltd, 167 Cal.App.4th 1187 (2008), a case relied upon by ConAgra in its motion, supports the conclusion that Mr. Arko should not be held to some unrealistic or impossible burden on causation in a case such as this, and therefore ConAgra's motion must be overruled. In light of the similarities in this matter to the *Sarti* decision and its authoritative review of California law on causation in food poisoning cases, a detailed review of the *Sarti* Court's holding is in order.

On April 7, 2005, Plaintiff Sarti and a friend ate at the defendant Salt Creek Grille. Sarti, 167 Cal.App.4th at 1191[2/]. They shared an appetizer that included raw ahi tuna. Sarti became nauseous and chilled the next day. The day after that she suffered constant diarrhea, fever and chills. The diarrhea continued for the next 10 days. By April 19, Sarti was unable to move her legs and was having a hard time focusing her eyes. She was taken to the emergency room and put into intensive care where a neurologist diagnosed a variant of Guillain-Barre syndrome

---

[2]The citation to the factual summary contained in the following two paragraphs remains the same, unless otherwise noted.

(an immune response to foreign antigens like infections and damages the peripheral nerves). She was tested and found to have *Campylobacter* bacteria. Expert testimony would later indicate that Sarti's Guillian-Barre was an indiosyncratic immuno-suppressant response to the constant diarrhea brought on from *Campylobacter*.

Complicating matters for the plaintiff (and the Court) is that *Campylobacter* is not found in raw tuna, unless that tuna has been cross-contaminated by raw chicken, in which the bacteria is common. Sarti's illness was reported to the Orange County Health Department which ultimately issued a "food borne illness" report approximately one month after the meal. The report identified four practices at the Salt Creek Grille that could have lead to the cross-contamination. Specifically, wipe down rags were not being sanitized between wiping down surfaces; there was insufficient amounts of sanitizer in the dishwasher; chicken tongs were sometimes used for other foods; and raw vegetables were often stored under "raw meat" (the expert testifying did not say what kind of raw meat) so that a drop of raw meat juice might get on the vegetables.

The plaintiff sued the restaurant for breach of warranty, amongst other theories and following trial the jury returned a verdict of $725,000 in economic damages and $2.5 million in non-economic damages. Id. at 1192. The trial judge

perceived the jury's verdict was based on the inference that the practice of using the same wipe down rag had led to cross-contamination from raw chicken to raw tuna. Following the verdict, the defendant moved for judgment nothwithstanding the verdict ('JNOV'), which was granted by the trial court despite the Court's belief that Sarti had presented the jury with sufficient evidence to prove her case. Ibid. The reason for granting the JNOV was that the judge read Minder v. Cielito Lindo Restaurant, 67 Cal.App.3d 1003 (1977), as imposing a heightened causation standard on food poisoning cases and barring the use of inference to prove causation in such a case. Ibid. Therefore, the judge felt compelled by the Minder decision to grant the defendant's request for JNOV in spite of his feeling that the plaintiff's evidence could sustain the jury's finding. Ibid.

The Minder case involved a couple who developed food poisoning after eating brunch at the defendant's Mexican restaurant. Minder v. Cielito Lindo Restaurant, 67 Cal.App.3d 1003 (1977). Among the evidence presented a trial was a health inspection report prepared a couple of months before the plaintiffs' illness that detailed various general unsanitary conditions in the restaurant and testimony from the plaintiffs' treating physician that the plaintiffs' illness was the result of contaminated food. Minder, supra, 67 Cal.App. 3d at 1006-1007. The jury sided with the plaintiffs but the appellate court reversed the verdict

concluding the plaintiff had not presented sufficient evidence to link their illness with the consumption of the food at defendant's restaurant. Id. at 1008.

The court in Sarti conducted a detailed analysis of the holding in Minder and the bases for the Court's conclusion in that case. That analysis need not be summarized in detail here, but suffice it to say that while the Sarti court agreed with the ultimate decision in Minder based upon the specific facts of the case, it found the reasoning lacking in several respects and declined to follow it. Sarti, supra, 167 Cal.App.4th at 1194. In particular, the Court strongly disagreed with the suggestion in Minder that food poisoning cases are subject to some type of heightened proof of causation standard, holding:

> We cannot agree, however, with the strong implication in the *Minder* analysis that food poisoning cases are somehow unique tort law... Food poisoning cases follow the same rules as other tort cases: "The basic elements of proof in a food poisoning case are essentially those of any personal injury action."
>
> Sarti, supra, 167 Cal.App.4th at 1202.

The Sarti Court clearly rejected the Minder court's implication that food poisoning cases were subject to a different causation standard than other tort cases. Critical to the Sarti court's view to the success of the case before it, was the fact that, unlike in Minder, there was expert testimony expressly making the link between the particular kind of food poisoning involved (*Campylobacter*) and the

particular unsanitary conditions found at the restaurant - cross contamination from raw chicken. The Court held that in light of the varied ways contamination of Plaintiff's food could have occurred, a reasonably jury could have found in her favor. Sarti, supra, 167 Cal.App.4th at 1211.

Here, there is evidence far stronger than that in Sarti of unsanitary conditions at ConAgra's manufacturing plant resulting in salmonella positive testing throughout the plant. (UMF's 17-27) Similarly, the uncontroverted evidence of salmonella infested peanut butter inflicting injury upon hundreds if not thousands of unsuspecting consumers is overwhelming. (UMF's 17, 18 ) When viewing this evidence alongside Mr. Arko's evidence and testimony of individual causation (UMF's 31-33) it is abundantly clear that any reasonable trier of fact could hold ConAgra liable under various theories of liability plead by Mr. Arko, including breach of warranty and product defect. For these reasons, and under controlling California case law, Plaintiff has clearly met his burden on causation and therefore ConAgra's motion must be denied.

**D. Request for Additional Case Specific Discovery Per Rule 56(d)**

In the event this Court is entertaining ConAgra's arguments that Plaintiff's claims fail due to his being unable to produce the lid code from the subject bottle of peanut butter, Mr. Arko would respectfully request this Court deny ConAgra's

motion and allow Plaintiff the opportunity to engage in case-specific discovery on this issue upon remand. See F.R.C.P. Rule 56(d); see also Case Management Order. Upon remand, Mr. Arko intends to engage in discovery with Wal-Mart seeking evidence of the number of Great Value brand peanut butter bottles purchased with cash at their San Diego Super Center in the September, 2006 timeframe. Based upon evidence of purchase records, coupled with lot/batch numbers of ConAgra Great Value brand peanut butter sold at the San Diego Wal-Mart Super Center, Plaintiff contends additional evidence will be obtained further supporting his purchase of ConAgra's defective peanut butter.

## CONCLUSION

Based on the foregoing, Plaintiff Roger Arko respectfully requests that this Court deny ConAgra's motion for summary judgment.

Dated: April 7, 2011

THORSNES BARTOLOTTA McGUIRE

By: /s/ Brett J. Schreiber
JOHN F. McGUIRE
BRETT J. SCHREIBER
Attorneys for Plaintiff Roger Arko