IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE CONAGRA PEANUT BUTTER PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 1845<br>1:07-md-1845-TWT |
| KRYSTINA BRUGH<br>Individually, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CON AGRA FOODS INC.,<br>a Delaware Corporation,<br><br>    Defendant. | CIVIL ACTION FILE<br>NO. 1:08-CV-2932-TWT |

OPINION AND ORDER

This is a products liability action for injuries allegedly suffered from eating *Salmonella*-contaminated peanut butter.

I. Background

This action arose out of the distribution by ConAgra of peanut butter that was contaminated by *Salmonella* bacteria. The contaminated peanut butter was manufactured at the Defendant's plant in Sylvester, Georgia. It is undisputed that hundreds of people got sick after eating the contaminated peanut butter. On February

14, 2007, the Food and Drug Administration issued a national warning advising people not to eat from certain jars of ConAgra's Peter Pan brand or Great Value brand peanut butter due to a risk of bacteria contamination. At the same time, the FDA announced a recall of the implicated peanut butter. The FDA specifically identified the presence in the peanut butter of *Salmonella* bacteria.

K.B. was diagnosed at birth with dysplastic kidneys. She ate ConAgra peanut butter approximately 8 times between the last week of January 2007 and February 3, 2007. After eating the peanut butter, she developed symptoms of diarrhea, vomiting, nausea, fever and stomach cramps. This led to severe dehydration that K.B.'s dysplastic kidneys could not handle. K.B. went into end-stage renal disease and eventually underwent a kidney transplant. ConAgra has moved for summary judgment, arguing that the Plaintiffs cannot prove that the peanut butter was defective (that it was contaminated with *Salmonella*) and that K.B.'s injuries were proximately caused by her consumption of the peanut butter. ConAgra has also moved to exclude the expert opinions of Dr. Charles Stratton and Dr. Jose Oberholzer, who testify that the peanut butter was contaminated with *Salmonella* and that it caused K.B.'s injuries.

## II.  Legal Standards

    A.    <u>Daubert Standard</u>

Federal Rule of Evidence 702 governs the admission of expert opinion testimony. Pursuant to that rule, before admitting expert testimony a court must consider: (1) whether the expert is competent to testify regarding the matters he intends to address; (2) whether the methodology used to reach his conclusions is sufficiently reliable; and (3) whether the testimony is relevant, in that it assists the jury to understand the evidence or determine a fact in issue.  Fed. R. Evid. 702; <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993).  Furthermore, "the Court must find that [the expert] used a valid methodology based on <u>reliable data </u>to reach his opinions."  <u>Clarke v. Schofield</u>, 632 F. Supp. 2d 1350, 1360 (M.D. Ga. 2009) (emphasis added).  If the expert predicates his testimony on an assumption that is belied by the evidence, the expert's testimony is properly excluded.  <u>Ferguson v. Bombardier Services Corp.</u>, 244 Fed Appx. 944, 949 (11th Cir. 2007).  The party offering the expert's testimony has the burden to prove it is admissible by a preponderance of the evidence.  <u>Allison v. McGhan Medical Corp.</u>, 184 F.3d 1300, 1306 (11th Cir. 1999).

    B.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists

and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

### A.  The Defendant's Motion to Strike Dr. Stratton's Affidavit

Dr. Charles Stratton's affidavit is not untimely. Dr. Stratton was designated as a global-issue expert by the Plaintiffs' steering committee and the Plaintiffs' Liaison Counsel on behalf of all Plaintiffs in the MDL, on May 1, 2009. (Plaintiffs' Notice of Disclosure of Expert Witnesses, 1:07-md-1845, at Doc. 724.) The Plaintiffs were not required to disclose Dr. Stratton as an expert offering opinions regarding the CDC Case Definitions in advance of their response to the Defendant's Motion for Summary Judgment.

Dr. Stratton is qualified to offer expert testimony on CDC Case Definitions. Dr. Stratton is a medical doctor with specialized training in infectious diseases and clinical

microbiology. He is the Director of the Clinical Microbiology Laboratory at the Vanderbilt University Hospital, and has been a clinical microbiologist for over thirty years. (Stratton First Aff. ¶ 2.)

This Court has previously held that CDC Case Definitions are a reliable methodology for determining the presence of an infectious agent. (1:07-md-1845, Doc. No. 2262, at 3.) This Court cited <u>Cruz v. Secretary of Dep't of Health & Human Serv.</u>, No. 96-820V, 1998 WL 928418 (Fed. Cl. Dec. 21, 1998), and <u>Graham v. Playtex Products, Inc.</u>, 993 F. Supp. 127 (N.D.N.Y. 1998), in support of this holding. In <u>Cruz</u>, the court allowed expert testimony of a "probable case" of poliomyelitis when there was a CDC definition of a "probable case" of poliomyelitis directly on point. <u>Cruz</u>, 1998 WL 928418, at *5 ("The CDC defines a probable case of poliomyelitis, for reporting purposes, as one meeting the clinical definition: '[a]cute onset of a flaccid paralysis of one or more limbs with decreased or absent tendon reflexes in the affected limbs, without other apparent cause, and without sensory or cognitive loss.'"). In <u>Graham</u>, the court did not discredit expert testimony that stated that the plaintiff satisfied the CDC definition for toxic shock syndrome. <u>Graham</u>, 993 F. Supp. at 132. In both cases, the expert testified that the plaintiff met the CDC case definition that was established for that particular pathogen or illness.

In this case, the CDC has designated a case definition for *Salmonella* serotype

Tennessee emanating from ConAgra peanut butter. According to the CDC, "[a] case was defined as infection with *Salmonella* Tennessee with a PFGE pattern matching one of the three outbreak patterns in a person residing in the United States with symptom onset on or after August 1, 2006 (or, if onset date unknown, *Salmonella* Tennessee isolated on or after August 1, 2006)." (MMWR, at 522; Schnaffer Dep. at 238.) The CDC has elsewhere defined August 1, 2006, as the beginning of the outbreak period. (Pls.' Br. in Opp'n to Def.'s Mot. to Strike Aff. of Dr. Stratton, at Ex. 3, at 5-6.) "Production dates [of the contaminated peanut butter] rang[e] from July 2006 to December 2006." (MMWR, at 523.) The date marking the beginning of the outbreak period is significant because the Plaintiffs' peanut butter jar was manufactured on August 5, 2005. The Court bears in mind that the CDC Case Definitions are not legal tests, but merely guidelines to assist researchers. Dr. Stratton's application of the CDC guidelines is an acceptable application of a reliable methodology.

Even so, the Court could exclude Dr. Stratton's testimony if "there is simply too great an analytical gap between the data and the opinion proffered." General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). Dr. Stratton relies upon his education, training, and experience to conclude that none of the other possible causes for K.B.'s illness would likely have caused the severe dehydration that she suffered

and which lead to her end-stage renal disease. Given the well known difficulty in diagnosing *Salmonella* infection, negative blood and urine cultures are not dispositive. Blood and urine cultures are often unreliable for diagnosing a *Salmonella* infection, because those tests will only show a presence of *Salmonella* if the infection has spread to the blood or bladder. The Defendant's motion to exclude Dr. Stratton's testimony should be denied.

> B. The Defendant's Motion to Exclude Dr. Oberholzer's Causation Opinion

Dr. Jose Oberholzer is the surgeon who performed K.B.'s kidney transplant. Dr. Oberholzer stated unequivocally in his deposition several times that he did not make an "independent assessment" of whether K.B.'s gastrointestinal illness was caused by *Salmonella*:

> Q: Did you make an independent medical diagnosis as to the cause of her gastritis?
> A: No, and I had no reason to do that because when I saw her she was on dialysis and in need of a kidney transplant and had a very clear medical history.
> Q: So you didn't – as a physician you didn't diagnose Krystina as having gastroenteritis from a salmonella infection?
> A: I diagnosed her with the consequences out of it, that she had acute kidney failure on a chronic kidney disease and required a kidney transplant.
> Q: But you didn't make the independent assessment as to whether her gastritis was caused by salmonella or not?
> A: There was no need for that. The diagnosis was made. It sounded reasonable; it sounded likely. So for me, my role as a transplant surgeon was to discuss with her her new life as a transplant patient

> that she will face.
>
> ....
>
> Q: Who do you believe made the diagnosis of gastritis as a result of salmonella bacteria?
>
> A: As I remember and as I see from my document, she had been hospitalized in Indiana, so I remember there was a document from some hospital in Indiana. There was a document from a children hospital, Hope, I think, in Christ Hospital from Advocate system; and then also the discussion and documentation by Dr. Miller. So there was a series of doctors who had seen Krystina and diagnosed her with that.
>
> ....
>
> Q: Will you agree that your team, all the doctors here at the University of Illinois on the transplant team, nobody on the transplant team made an independent diagnosis or assessment as to what the cause of Krystina's gastritis was?
>
> ....
>
> A: No, because there was no reason for it. I have said that probably 11 or 12 times by now. By the time we saw Krystina she was in kidney failure, on dialysis, in need of a transplant. So my role is totally different. I'm a transplant surgeon.

(Oberholzer Dep. at 94-97.)

Later in his deposition, Dr. Oberholzer completely changed his testimony and testified that he had in fact performed an independent assessment of K.B.'s illness:

> Q: But again, you haven't made an independent assessment or medical diagnosis that her illness was –
>
> A: Yes, I did. I did the history of this patient and I saw the patient and asked the patient was happened; and, you know, I know it sounds very unlikely in your job, but sometimes 2 and 2 actually equals 4.
>
> Q: Let me finish my question because I don't –
>
> A: I did an independent examination of the patient of which you have documentation.

(Oberholzer Dep. at 150.)

Dr. Oberholzer now contends in an affidavit that he did make an independent assessment of K.B. (Oberholzer Decl. ¶ 3.) "A district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation." Bryant v. U.S. Steel Corp., 428 Fed. Appx. 895, 896 (11th Cir. 2011), quoting Van T. Junkins and Assocs. v. U.S. Indus., 736 F.2d 656, 656 (11th Cir. 1984). "[P]arties cannot thwart the purposes of Rule 56 by creating sham issues of fact with affidavits that contradict their prior depositions." Bank of Illinois v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1168 (7th Cir. 1996); also see Adelman-Tremblay v. Jewel Cos., Inc., 859 F.2d 517, 521 (7th Cir. 1988) ("The purpose of summary judgment motions–to weed out unfounded claims, specious denials, and sham defenses–is served by a rule that prevents a party from creating issues of credibility by allowing one of its witnesses to contradict his own prior testimony.") (internal citations and quotations omitted).

Even though Dr. Oberholzer changed his testimony in his deposition, his earlier testimony that he did not perform an independent assessment of K.B. was so clear and vigorous, repeated, and supported by reasoning, that the Court cannot determine that the contradiction was the result of an honest discrepancy. See Bank of Illinois, 75 F.3d at 1169 n.10 (noting that the sham affidavit rule applies when the statements are

inherently inconsistent and when the contradiction is not the result of an honest discrepancy or newly discovered evidence). Where a witness affidavit unambiguously contradicts prior deposition testimony, the affidavit should be disregarded unless the witness provides a valid explanation. Bryant, 428 Fed. Appx. at 896-97. Neither of the Plaintiffs' counsel's explanations–that it was his first deposition and that there was a language barrier–are valid in the face of the type of clear, unambiguous and repetitive statements here. Moreover, counsel's argument is not evidence. Id. Dr. Oberholzer himself simply states, "To the extent, if any, there is any uncertainty in my deposition as to whether I made an independent diagnosis or assessment of K.B., I now make clear that I did make an independent diagnosis and assessment of K.B." (Oberholzer Decl. ¶ 3.) Dr. Oberholzer's statement is not an explanation at all, much less a valid one. If Dr. Oberholzer did not perform an independent assessment of K.B., his causation opinion that she had salmonellosis as a result of eating ConAgra peanut butter is clearly unreliable. The Court will not consider Dr. Oberholzer's affidavit in ruling upon the Defendant's Motion for Summary Judgment.

      C.     The Defendant's Motion for Summary Judgment

"[U]nder the Indiana Strict Product Liability Act a plaintiff may use circumstantial evidence to establish that a manufacturing defect existed only when the plaintiff presents evidence by way of expert testimony, by way of negating other

reasonably possible causes, or by way of some combination of the two." Whitted v. General Motors Corp., 58 F.3d 1200, 1209 (7th Cir. 1995).  Yet, the evidence relied upon to overcome summary judgment must be admissible evidence.  Id. at 1204.  For the reasons set forth above, Dr. Stratton's expert testimony on the cause of K.B.'s illness is admissible under Rule 702.  He is a highly qualified expert.  He is not a quack or a hired gun.  There is a genuine issue of fact for trial in this case.

## IV.  Conclusion

For the reasons set forth above, the Defendant's Motion to Strike the Affidavit of Dr. Charles Stratton [Doc. 47] is DENIED.  The Defendant's Motion to Exclude the Causation Opinion of Dr. Jose Oberholzer [Doc. 58] is GRANTED.  The Defendant's Motion for Summary Judgment [Doc. 30] is DENIED.

SO ORDERED, this 14 day of August, 2013.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge